***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar and the briefs and arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement which was filed on April 12, 2000, and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant was a duly qualified self-insured, with Key Benefit Services, Inc., as the servicing agent.
3. An employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's average weekly wage was $320.00, which yields a compensation rate of $213.44 per week.
5. The issues for determination are:
 a. Whether plaintiff sustained an injury by accident or as a specific traumatic incident of the work assigned, and if so, to what benefits may he be entitled under the Act.
 b. Whether plaintiff gave timely notice of his injury, as required under the provisions of N.C. Gen. Stat. § 97-22.
6. The parties stipulated the following documents into the record:
a. I.C. Forms 18, 61, 33, and 33R, and
b. Medical and vocational records, thirty-nine pages.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 47 years old and was a high school graduate. On August 21, 1998, the defendant-temporary staffing service employed plaintiff, assigning him to work at Waste Management Services. Plaintiff's duties included picking up trash, driving the truck, and sorting items for recycling. He had also worked for two days in April of 1998 for the defendant-employer.
2. On August 31, 1998, plaintiff was required to jump repeatedly off of a recycling truck while he was lifting and emptying wet recycling bins. On the same day, he began, for the first time, to experience pain, starting first in his shoulders and then progressing to his neck, with the pain gradually intensifying over time. Eleven days later, his orthopedic surgeon diagnosed him as suffering cervical radiculopathy.
3. As a result of that cervical radiculopathy, plaintiff has been totally or partially disabled from September 5, 1998 through the date of the hearing before the Deputy Commissioner and continuing even though he has repeatedly attempted to return to work. His neurosurgeon testified without contradiction, and the Full Commission finds as fact, that plaintiff is currently totally disabled from his pain and that his cervical radiculopathy was caused by his injury at work: "So what caused his cervical radiculopathy which is what I addressed in the surgical procedure was the accident at work."
4. On August 31, 1998, the recycling truck on which plaintiff was working had a broken compactor, causing trash to stick in the compactor. As a result, after lifting the recycling container to empty it into the compactor, plaintiff would then have to climb onto the truck and shake the compactor so that the trash would go down properly. After shaking the compactor, plaintiff would jump 2 to 3 feet down to the ground with his hand on the truck to break his fall. Because it was raining, the recycling containers were heavier and the men were also forced to move more quickly than usual.
5. By lunchtime, the repeated jumping off the truck and lifting of the wet recycling containers had taken its toll. Plaintiff's shoulder began hurting. When he finished work, he reported to Jim Dale — the supervisor of plaintiff's foreman at Waste Management — that his shoulder was aching, but that he thought he could continue working.
6. At the time that plaintiff completed his work and made his report to Mr. Dale, the B B Staffing office was closed. On the next morning, however, the foreman, "Vinney," notified Todd Lambeth of B B Staffing that plaintiff had reported that his shoulders were feeling tight as a result of his work, but that he felt that he could continue working.
7. Plaintiff continued to work on Tuesday, Thursday, and Friday although he was experiencing a gradual increase in pain. On Friday, September 4, he spoke to Mr. Lambeth when he picked up his check at B B. Plaintiff explained to Mr. Lambeth that he had pain in his shoulders from jumping off of the truck. Mr. Lambeth simply asked why plaintiff had not reported the problem to him earlier in the week. Plaintiff explained that he had thought that Waste Management was his employer for purposes of reporting injuries.
8. On Saturday, September 5, plaintiff woke up and feared that he was having a heart attack because of the pain. Because he could not stand or sit up, his wife took him to the emergency room. The emergency room note reported that plaintiff had experienced pain in his arm while lifting to put recyclables in his truck, but that he continued to work with increasing discomfort. The hospital diagnosed him as suffering shoulder pain, placed him in a shoulder immobilizer, and prescribed Co-Gesic and Relafen. The doctor instructed him to consult with an orthopedist if he did not experience improvement over the next 3 to 5 days.
9. Plaintiff could not call his employers immediately because he went to the emergency room on a Saturday. The emergency room left a message on B B's answering machine reporting plaintiff's visit. Plaintiff called his foreman on Monday and reported that he had been hurt on the job. On Friday, he also called Mr. Lambeth, who claimed that since plaintiff had reported the injury too late, the company was denying him workers' compensation.
10. On September 11, 1998, plaintiff saw Dr. Robert Moore, an orthopedic surgeon. Plaintiff reported to Dr. Moore that he had experienced pain in his left neck, shoulder, and upper extremity since early in September. He explained that he had first felt the pain when lifting while throwing things into the recycling truck. While the pain had initially been mild, it gradually became more severe over the next few days. Dr. Moore noted that plaintiff was suffering radiation of pain into his left scapular area and left arm, forearm, and hand, with a diffuse sensation of tingling and numbness in his left hand on an intermittent basis. Plaintiff had not, prior to September 1, 1998, experienced any similar problems.
11. Dr. Moore found considerable exacerbation of the left neck and shoulder pain at the end ranges of extension and rotation. He observed tenderness over the left cervical paravertebral muscles and trapezius region, as well as the left medial scapular border. He diagnosed plaintiff as suffering cervical radiculopathy or, in other words, a pinched nerve. He recommended conservative measures, including complete bed rest, cervical halter traction, and local heat application. He also removed plaintiff from work.
12. On September 18, 1998, Dr. Moore noted some improvement, but observed that plaintiff was still experiencing pain radiating into his left arm when he was upright. Dr. Moore recommended continued conservative measures, emphasizing to plaintiff the importance of nearly full time bed rest with traction. By September 25, 1998, plaintiff showed marked improvement as a result of the bed rest and traction for 6 to 7 hours a day. Dr. Moore authorized plaintiff gradually to increase his activity level, but advised him to avoid lifting weights greater than 15 pounds. Plaintiff did not return to Dr. Moore for a while because he could not afford to pay for his treatment. Despite his pain, he continued to try to work for B B Staffing in order to support his family.
13. On November 18, 1998, he returned to Dr. Moore. His symptoms had improved, but not resolved. He had pain in his left neck and shoulder region, which was radiating into his left arm as far as his elbow. He also was experiencing numbness in his left ring and small fingers. Dr. Moore diagnosed "persistent cervical radiculopathy" and recommended that plaintiff remain out of work while again pursuing conservative measures.
14. In early 1999, plaintiff attempted to work for CLK Construction driving a dump truck. He had to leave the job after 1 to 1-1/2 months because of troubles getting in and out of the truck.
15. In March 1999, plaintiff again visited Dr. Moore, explaining that when he had stopped the traction and medication, his symptoms had returned. He was still having pain in the left side of his neck and shoulder with some intermittent numbness in his left arm extending to his left index and long fingers. Dr. Moore referred plaintiff to Dr. George Huffmon so that he could pursue surgery.
16. Because of increased pain, plaintiff went to the emergency room again on April 9, 1999. The hospital noted that, as a result of an August 1998 work injury, he was suffering pain in the left side of his neck radiating to the left shoulder and down his left arm with numbness and tingling in his left hand. The hospital observed that he had difficulty raising his left arm, had weakness of the deltoid, and had decreased grip on the right.
17. On April 12, 1999, plaintiff consulted with Dr. Huffmon, who diagnosed him as suffering two cervical herniated discs and recommended surgery. Dr. Huffmon observed a decreased range of motion secondary to pain, weakness in his biceps and brachioradialis, and decreased sensation in his left thumb area on the lateral aspect of his arm. Plaintiff's sensory exam was also abnormal.
18. On July 9, 1999, plaintiff was still experiencing considerable neck pain and left arm pain and numbness. He was even having difficulty sleeping because of the pain. Dr. Huffmon diagnosed plaintiff as having cervical spondylosis C4-5, C5-6 "with large herniated nucleus pulposus to the left at both levels." Dr. Huffmon decided to do an anterior discectomy and fusion with a plate using bone bank bone.
19. The surgery was performed on September 1, 1999. Dr. Huffmon performed discectomies at C4-5 and C5-6, removing the entire disc. He grafted plaintiff with cadaveric bone and placed a plate on the fusion to hold it in place and promote fusion.
20. Even after the surgery, plaintiff has continued to experience substantial pain. Although he had worked for Guarantee Systems as a manager from April 1999 through the date of surgery on September 1, 1999, he was not able to return to that work following the surgery.
21. In September 1999, plaintiff voluntarily began working with the Division of Vocational Rehabilitation Services. The Division's report indicated that plaintiff had undergone surgery on September 1, 1999 to correct herniated discs and that he should be restricted to sedentary work and lifting of 10 pounds only.
22. In December 1999, plaintiff began visiting the Southeastern Center for Mental Health. They noted that he had been depressed since his surgery, feeling hopeless, helpless and frustrated because he was no longer able to be gainfully employed. They reported that he had experienced thoughts of suicide with an established plan. The Center diagnosed him as suffering major depression.
23. Because of the continued pain, Dr. Huffmon referred plaintiff to pain management and physical therapy and prescribed non-steroidal anti-inflammatory drugs. On February 14, 2000, Dr. Huffmon observed that plaintiff was still having pain with some days better than others. When the pain was continuing in April and June 2000, Dr. Huffmon concluded that plaintiff could not, because of the pain, do any type of work. He has given plaintiff a rating of 28.57% to the spine.
24. The greater weight of the evidence supports the conclusion that plaintiff's cervical radiculopathy was the result of a specific traumatic incident at work. The evidence is undisputed that plaintiff had no problems with his neck or cervical spine prior to August 31, 1998. His symptoms first occurred when he was required repeatedly to jump off his truck while also repeatedly dumping wet recycling containers. Although plaintiff had some signs of arthritis, Dr. Huffmon confirmed, based on his review of the MRI, and the Full Commission finds as fact, that the herniated discs causing the cervical radiculopathy "were absolutely not degenerative."
25. The uncontroverted medical testimony of Dr. Huffmon causally related plaintiff's back problems to the August 31, 1998 incident. He testified:
 I believe the cause of his pain and the cause of his cervical radiculopathy was caused by his injury at work. I cannot tell you with 100 percent accuracy. I can tell you with a substantial degree of medical certainty that I felt that his herniated discs were due to the work accident. However, as we all know there is nothing I can give you a 100 percent accuracy on. The fact that he may have had the herniated disc prior to this is a moot point because the pain started whenever he did this action at work. He did not have any pain prior to that so if he did have the herniated discs prior to that they were asymptomatic. So what caused his cervical radiculopathy which is what I addressed in the surgical procedure was the accident at work.
26. Dr. Moore did not testify to the contrary — he merely stated that he had no opinion as to the cause of the cervical radiculopathy. He acknowledged, however, that cervical radiculopathy could be triggered by trauma.
27. Plaintiff's compensable injuries from the specific traumatic incident have left him without the ability to earn wages.
 ***********
Based upon the foregoing Findings of Fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable specific traumatic incident on or about August 31, 1998. N.C. Gen. Stat. § 97-2(6).
2. There are two theories upon which a back injury can be compensated: (1) if the claimant was injured by accident; or (2) if the injury arose from a specific traumatic incident. Fish vs. Steelcase, Inc.,116 N.C. App. 703, 449 S.E.2d 233 (1994), cert. denied, 339 N.C. 737,454 S.E.2d 650 (1995); Glynn v. Pepcom Industries, 122 N.C. App. 348,469 S.E.2d 588 (1996). The 1983 amendment, which added the second theory, was enacted by the Legislature with the intent to relax the often-stringent requirement of the definition of accident. Bradley v.E.B. Sportswear, Inc., 77 N.C. App. 450, 335 S.E.2d 52 (1985). InRichards v. Town of Valdese, 92 N.C. App. 222, 374 S.E.2d 116 (1988),disc. review denied, 324 N.C. 337, 378 S.E.2d 799 (1989), the Court stated that
 the General Assembly recognized the complex nature of back injuries, and did not intend to limit the definition of specific traumatic incident to an instantaneous occurrence. Back injuries that occur gradually, over long periods of time, are not specific traumatic incidents; however, we believe that events which occur contemporaneously, during a cognizable time period, and which cause a back injury, do fit the definition intended by the legislature.
Id. at 225, 374 S.E.2d at 118-19.
3. Plaintiff's compensable injuries resulted in loss of earning capability, wage loss, and medical costs, including back surgery. Plaintiff is entitled to temporary total compensation of $213.44 per week (two thirds of the stipulated average weekly wage) from September 5, 1998, until he returns to work at the same or greater wages or until further order of the Industrial Commission. The compensation shall be pro-rated for partial weeks and partial days, for those weeks, partial weeks and partial days he was unable to work by reason of his compensable injuries and medical care.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay for the surgery and all other medical costs resulting from plaintiff's injuries and resulting depression that were or are reasonably necessary to effect a cure or provide relief. This includes medical visits and medication both past and present and in the future.
2. Defendants shall pay to plaintiff temporary total compensation of $213.44 per week from September 5, 1998, until he returns to work at the same or greater wages or until further order of the Industrial Commission. Such compensation shall be pro-rated for partial weeks and partial days, for those weeks, days or partial days he was unable to work by reason of his compensable injuries and medical care. Such of the foregoing that has accrued to the date of this Opinion and Award shall be paid in a lump sum, subject to the attorney fee set forth below. Thereafter, any ongoing compensation shall be paid weekly the week after it occurs with 25% of such amount payable to plaintiff's attorney.
3. Defendants shall pay directly to plaintiff's attorney 25% of the lump sum set forth in paragraph 2 above and 25% of any other compensation payable to plaintiff.
4. Defendants shall pay interest at the rate of 8 percent per year on all compensation due plaintiff, from the date of the hearing before the Deputy Commissioner until paid.
5. Defendants shall pay the costs.
This 18th day of December 2001.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER